**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KENNETH MOSLEY,** | § | |
| **PETITIONER,** | § | |
| | § | |
| **V.** | § | |
| | § | **No. 3:03-CV-1577-R** |
| **NATHANIEL QUARTERMAN,** | § | |
| **DIRECTOR, TEXAS DEPARTMENT** | § | |
| **OF CRIMINAL JUSTICE,** | § | |
| **CORRECTIONAL INSTITUTIONS** | § | |
| **DIVISION,** | § | |
| **RESPONDENT.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This cause of action was referred to the United States Magistrate Judge pursuant to the

provisions of Title 28, United States Code, Section 636 (b), implemented by an order of the United

States District Court for the Northern District of Texas.   The Findings, Conclusions, and

Recommendation of the United States Magistrate Judge follow:

**FINDINGS AND CONCLUSIONS**

**I.     NATURE OF THE CASE**

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28,

United States Code, Section 2254.

**II.    PARTIES**

Petitioner, Kenneth Mosley, is an inmate in the custody of the Texas Department of Criminal

Justice, Correctional Institutions Division (TDCJ-ID).   Respondent is the Director of TDCJ-ID.

### III.    PROCEDURAL HISTORY

A jury convicted Petitioner of capital murder, and his punishment was assessed at death by lethal injection.  *State v. Mosley*, F97-22324 (283rd Judicial District Court of Dallas County, Tex. October 16, 1997).  The case was appealed to the Texas Court of Criminal Appeals, and the Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished opinion.  *Mosley v. State*, No. 73,012 (Tex. Crim. App. May 10, 2000).  After Petitioner filed a motion for rehearing, that court withdrew a portion of its opinion and substituted another opinion, reaffirming its decision on all points of error and leaving the remainder of the original opinion intact.  *See Mosley v. State*, No. 73,012 (Tex. Crim. App. June 25, 2003), *cert. denied*, 540 U.S. 1185 (2004).  Petitioner filed a state application for writ of habeas corpus on July 17, 2000.  The Court of Criminal Appeals adopted most, but not all, of the trial court's findings and conclusions and denied relief based upon the findings and conclusions and its own review in an unpublished order.  *Ex parte Mosley*, No. 50,421-01 (Tex. Crim. App. July 2, 2002).

Petitioner filed his federal petition for writ of habeas corpus on February 22, 2005, Respondent filed an answer on June 17, 2005, and furnished the state court records, and Petitioner filed a reply on October 4, 2005.

### IV.    RULE 5 STATEMENT

Respondent does not assert that Petitioner failed to exhaust any of the grounds for relief he raises in his federal petition.

**V.      ISSUES**

Petitioner raises the following ten grounds for relief:

A.      Petitioner was denied effective assistance at the guilt phase of the trial because his trial counsel failed to make an appropriate objection to the introduction of impermissible victim impact evidence (ground four);

B.      Petitioner was denied effective assistance at the guilt phase of the trial because his trial counsel failed to make an appropriate objection to the prosecution's closing argument concerning inadmissible victim impact evidence (ground five);

C.      Petitioner was denied effective assistance at the guilt phase of the trial because his trial counsel failed to make an appropriate objection to evidence presented of a prior consistent statement that impermissibly bolstered a crucial witness's testimony (ground six);

D.      Petitioner was denied effective assistance at the guilt phase of the trial because his trial counsel placed into evidence witness reports containing hearsay without requesting a limiting instruction (ground seven);

E.      Petitioner was denied effective assistance at the guilt phase of the trial because his trial counsel failed to obtain DNA testing on one of the bullets recovered at the crime scene (ground eight);

F.      Petitioner was denied effective assistance of counsel at the punishment phase of the trial because his trial counsel failed to conduct a meaningful investigation into possible mitigating evidence (ground one);

G.      Petitioner was denied effective assistance of counsel at the punishment phase of the trial because his trial counsel failed to introduce available mitigating evidence (ground two);

H.      Petitioner was denied effective assistance on appeal because his appellate counsel failed to raise a meritorious claim concerning the exclusion of a jury charge on the lesser included charge of felony murder (ground nine);

I.      Petitioner was denied effective assistance on appeal because his appellate counsel failed to raise a meritorious claim concerning the State's improper impeachment of defense witness Jasper Mallard (ground ten); and

J.      The Texas system, which does not require that a jury be informed about a capital murder defendant's parole eligibility if given a life sentence, violates the Eighth and Fourteenth Amendments to the Constitution (ground three).

4

Petitioner also contends that the state habeas court's findings are not entitled to deference because the state habeas court adopted the State's proposed findings. Finally, Petitioner asserts he is entitled to an evidentiary hearing.

## VI.     STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000).  With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529

U.S. at 413.   Under *Williams*, a state court unreasonably applies Supreme Court precedent if it

"unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where

it should not apply or unreasonably refuses to extend that principle to a new context where it should

apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir.

2000), *cert. denied*, 532 U.S. 949 (2001).   Under § 2254(d)(2), federal courts "give deference to the

state court's findings unless they were "based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363

(5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000).   The resolution

of factual issues by the state court is presumptively correct and will not be disturbed unless the state

prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas corpus petitions which, as with the instant case,

were filed after April 24, 1996, provided that they were adjudicated on the merits in state court.

*Lindh v. Murphy*, 521 U.S. 320, 326 (1997).   Resolution on the merits in the habeas corpus context

is a term of art that refers to the state court's disposition of the case on substantive rather than

procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

## VII.   FACTUAL BACKGROUND

The evidence presented at trial established that at around noon on February 15, 1997,

Petitioner entered a Bank One in Garland, Texas, wearing layered, heavy clothing that appeared

inappropriate for the warm weather. (R. 36:133, R. 37:72-3).   One of the tellers recognized

Petitioner as the person who had robbed the bank the previous month.   She spoke to her supervisor

who contacted their security company and called 911. (R. 36:60-1, 105, 110).   As a result of the 911

call, Garland police officer David Moore responded to a suspicious person call at the bank and entered the bank alone. (R. 36:67, 113, 176, 179, R. 38:10).  Several customers and employees of the bank testified at trial that they observed Moore approach Petitioner, who was standing in the commercial customer line.  After a short conversation between the two men, observers saw a scuffle, saw Petitioner reach under his shirt and pull out a gun, and heard gun shots. (R. 36:68, 87, 137-39, R. 37:50-1, 77-8, 181-82, R. 38:38-41).  At some point during the shooting, Officer Moore and Petitioner went through a window at the bank, landing outside in an alcove. (R. 36:7, R. 37:112, 125, 150-51 ).  Petitioner left this area, but was shot in the hand by another officer nearby after he did not respond to commands to drop the gun and get on the ground. (R. 36:204-07, R. 37:24-8).  Officer Moore was found lying in the alcove, with his weapon in his hand, shot several times and unresponsive to attempts at CPR. (R. 36:216-17, R. 37:168-73, R. 38:82-4, 93–9).

Forensic examination of the scene and Petitioner's gun revealed that there were four spent .9 millimeter shell casings found in and around the alcove, all of which were determined to have been ejected from Petitioner's gun, and one spent casing was still jammed in Petitioner's .9 millimeter gun, meaning that five shots had been fired from Petitioner's gun. (R. 38:130, 155-56, 182, R. 40:70).  A .40 caliber casing was found next to Officer Moore's gun and determined to have been fired from his gun, which was missing one round. (R. 38:156, R. 40:59, 61).  A projectile, determined to have been fired from Petitioner's gun, was found in the bottom of a drawer in a file cabinet inside the bank, having gone through a wall and the cabinet. (R. 38:135-38, R. 40:70-1).  Officer Moore had five gunshot wounds, two to the chest, one to the shoulder, one through the arm and into the side of the chest, and one through the back of his index finger.  One bullet was retrieved from his clothing at the hospital, one was found underneath his shoulder during the autopsy, one was

lodged in the skin of the back, and one was found in his kidney (R. 38:22, 71-3).  All of these bullets were fired from Petitioner's gun. (R. 40:70-2).  A firearms expert testified that Petitioner's gun had a safety that had to be disengaged before firing, that it was a semi-automatic gun with a trigger pull of between six and one half and seven and three quarter pounds, and that it therefore did not have a hair trigger or a hard pull trigger. (R. 40:64, 68, 82).  The same expert also testified that, after listening to the 911 tape that recorded the phone call from the bank, in his opinion six shots were fired at the scene, with a pause between the first and the next four shots, then another five or six second pause before the last shot. (R. 40:79-80, 82).  After Petitioner was arrested at the scene by another responding officer, a pair of latex gloves and a note were found on him.  The note stated that: "[t]his is a hold up, I have a gun, put money in bag." (R. 38:74-5).

Petitioner testified at trial on his own behalf.  He testified that he went to the bank in order to rob it to buy drugs. (R. 41:47).  He stated that he took the gun with him into the bank because one of the windows in his truck was missing and he did not feel comfortable leaving the gun in the truck. (R. 41:48).  Petitioner further testified that he did not see the officer approach him, but the officer tapped him on the shoulder and said that he wanted to see Petitioner's hands.  After Petitioner showed him his hands, the officer walked around him to the other side and grabbed his wrist.  Petitioner snatched his hand back, turned to walk away, and pulled his gun out in order to get rid of it.  The officer then grabbed the hand that held the gun, Petitioner grabbed the officer's hand to assist him, the officer went to pull his gun out of his holster, and Petitioner grabbed at the officer's hand to keep him from pulling his gun out. (R. 41:49-52).  Petitioner further testified that he next remembered hitting the ground outside of the window, the officer took his gun out of his holster and laid back, Petitioner tried to give his gun to the officer, and the officer's gun went off. (R. 41:52-3).

Petitioner maintained that he never knew that his gun went off, he was not aware that the officer had been shot, he did not intend to kill the officer when he pulled out his gun, and he left the alcove after the officer's gun went off. (R. 41:53-60). Petitioner also testified that the officer did not take his gun out of the holster until they were outside and that he was not on drugs that day. (R. 41:61).

Jasper Mallard also testified for the defense. He testified that he was in a store across the street from the bank and, after hearing shots fired, looked out the window. He saw a scuffle between Petitioner and the officer, who were both standing outside of window. The police officer dropped to the ground as shots were being fired. After the officer was on the ground Petitioner, who was still standing, looked around and then walked away. Mallard acknowledged on cross-examination that it looked like Petitioner kept pulling the trigger on his gun as often as he could towards the officer. (R. 40:115-120, 124).

## VIII.   PROCEDURAL ISSUE

Petitioner asserts that the findings issued by the state habeas court should not be given deference by this Court as dictated by 28 U.S.C. § 2254(d) & (e)(1). In particular, Petitioner argues that the habeas court's findings should not be given deference because that court adopted the State's proposed findings almost in their entirety. In response, Respondent contends that the fact that the state habeas court adopted the State's proposed findings does not destroy the deference accorded by the AEDPA.

As Respondent notes, the Fifth Circuit has held that it is not improper for a state habeas court to adopt a party's findings. *See Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999); *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995). While Petitioner cites to several federal cases that raise issues with a court's adoption of a party's proposed findings, none are federal habeas cases and therefore none

9

suggest that the deferential standard under § 2254 should be abandoned should a court adopt the proposed findings submitted by a party.  Petitioner further argues that the findings should not be accorded deference because the state trial judge adopted most of the proposed findings and corrected a few, but not all, of the typographical errors in the State's proposed findings, but Petitioner cites no case law as support for this contention.  Moreover, it should be noted that the Texas Court of Criminal Appeals, the court that in the end determines the outcome of any death penalty habeas case in Texas, declined to adopt numerous findings made by the state habeas court, which were proposed by the State.  In particular, that Court declined to adopt findings #46-9, 128-33, 146, 148, 149, 160-185, and 256-343, some 127 findings out of a total of 343 findings. *See Ex parte Mosley*, No. 50,421-01 (Tex. Crim. App. July 2, 2002).  Therefore, Petitioner's complaints regarding the state habeas court's method of arriving at findings and conclusions do not extend to the findings that were actually adopted at the state level and are therefore before this Court.  Accordingly, these findings are entitled to deference under the AEDPA.

## IX.    EXAMINATION OF THE GROUNDS FOR RELIEF

### Ineffective Assistance of Counsel Claims

In nine of his ten grounds for relief, Petitioner asserts that he was provided ineffective assistance of counsel in violation of his Sixth Amendment rights at various stages of his case.  In particular, Petitioner asserts that he received ineffective assistance of counsel during the guilt and punishment phases of the trial and on appeal.

*Standard of Review*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980).

In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id.* at 687.   Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689.  And prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 2068.  *See also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

The federal constitution also guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  In the context of appeals, the Constitution does not require an appellate attorney to advance every conceivable argument, and it can be effective assistance of counsel on appeal to focus on a few key issues. *Evitts v. Lucey*, 469 U.S. at 394; *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989), *modified on other grounds*, 920 F.2d 251 (5th Cir. 1990).

*Analysis*

1.   Victim Impact Evidence claims

In his fourth ground for relief, Petitioner asserts that his trial counsel were ineffective for failing to object to the admission of impermissible victim impact evidence in the form of testimony from the victim's widow during the guilt phase of the trial.  In his fifth ground for relief, Petitioner

asserts that his trial counsel were ineffective for failing to object to a portion of the prosecution's closing statement that mentioned this testimony.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court held that the Eighth Amendment did not prohibit the admission of victim impact evidence at the sentencing stage of a capital murder trial, and thus overruled its previous case law on this subject. *Id.* at 827.  Instead, the Court held that a state may "legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 825.  The Supreme Court, however, also stated that the Due Process Clause of the Fourteenth Amendment still prohibits the introduction of evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825.

With regard to the guilt phase of the trial, the Supreme Court in *Payne* observed that, in many cases, evidence relating to the victim is before the jury during the guilt phase "at least in part because of its relevance at the guilt phase of the trial." *Id.* at 823.  Citing *Payne*, the Fifth Circuit has noted that the Eighth Amendment does not erect a *per se* bar to the admission of victim impact evidence or prosecutorial argument on that topic at the guilt phase of the trial.  Rather, it is only when such evidence or argument is unfairly prejudicial does it violate a defendant's due process rights. *Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir. 1998).

In the instant case, the victim's widow, Sheila Moore, testified at the guilt phase of the trial that she had known her husband since high school, that they had three children, and that she worked as a CPA. (R. 38:104-06).  She further testified about her actions on the Saturday her husband died, both before and after she was informed that he had been shot, including errands she ran.  (R. 38:107-110).  She also testified about how she was informed that her husband had been shot and how she

12

learned he had died while at the police station and afterwards went to the hospital and held his hand. (R. 38:114-17).  During closing arguments at the guilt phase of the trial, the prosecution referenced the fact that the victim was a loving father and husband, who kissed his wife goodbye that morning. The prosecutor also stated during argument that, at the time the victim was dying, his children were at a pizza parlor and his wife tried later to call him.  The prosecutor further described how Sheila Moore was told about the shooting and her actions in going to see his body. (R. 42:127-28, 133-36). Defense counsel did not object to either the testimony itself or these portions of the closing argument.

The Court of Criminal Appeals adopted the state habeas court findings which concluded that no improper victim impact evidence was admitted at the guilt phase of the trial, that counsel were not deficient for failing to object to the testimony or the argument, and that prejudice had not been shown because Petitioner had failed to show a reasonable probability that the outcome of the trial would have been different had counsel objected to either the testimony or argument. (SHTr. II:495, 498-99).  These conclusions are not an unreasonable application of the *Strickland* standard.

Initially, Respondent argues that the testimony given by Sheila Moore is not, in fact, victim impact testimony.  There is some support for this argument in *Payne*.  For example, in the majority opinion in *Payne*, victim impact evidence is described in various places as "a quick glimpse of the life" of the victim, evidence that demonstrates the loss to the victim's family and society and the impact of the crime on the family, evidence that shows a victim's uniqueness as a human being, and evidence regarding the specific harm caused by the defendant. *Payne*, 501 U.S. at 822-23, 825.  And, the relevant victim impact statement that was ruled admissible in *Payne* described the personal characteristics of the victims, the emotional impact of the crimes on the family, and the family

13

members' opinions of the crime and the defendant. *Id.* at 817.  Furthermore, in a concurring opinion in *Payne*, authored by Justice Souter and joined by Justice Kennedy, Justice Souter referred to "common contextual evidence" about a victim, his career, and his family, that would be relevant and admissible in the guilt phase of a capital murder trial. *Id.* at 840-41.  This language suggests that much of Sheila Moore's testimony about her children and the manner in which she spent the day is contextual evidence, not victim impact evidence.

But, even were some of Sheila Moore's testimony, such as her testimony regarding her reaction upon hearing that her husband was shot or her testimony about visiting him in the hospital, considered victim impact testimony, its admission at the guilt phase of Petitioner's trial does not violate his constitutional rights unless it is determined to be unduly prejudicial.  Given the comparative brevity of Mrs. Moore's testimony, especially regarding her feelings about her husband's murder, and the related argument and the fact that the vast majority of testimony and argument centered on the issue of whether Petitioner intended to kill and/or shoot the victim, it cannot be said that Petitioner was unduly prejudiced by this testimony and argument.  Accordingly, Petitioner's counsel was not deficient for failing to object to the testimony or argument and, more importantly, Petitioner has failed to establish a reasonable probability that he would not have been convicted of capital murder had counsel objected.  Petitioner's fourth and fifth grounds for relief and without merit, and it is recommended that they be denied

2.    Bolstered Testimony claim

In his sixth ground for relief, Petitioner claims that his trial counsel rendered ineffective assistance of counsel because they failed to object to the admission into evidence of testimony that served to bolster a witness's testimony.  In particular, Petitioner asserts that his counsel were

ineffective for failing to object to the State questioning a witness regarding a prior oral statement that was consistent with her testimony that she saw Petitioner shoot the victim while he was lying on the ground.

At trial, Brandy Johnson testified for the State. She testified that she worked at an eyeglass place located across the street from the Bank One in Garland. She further testified that, on the day of the shooting, she heard two gunshots and went to the window. She saw a person on the ground in front of the bank and saw a man in a knit cap look around, saw his hand recoil as he fired a silver automatic gun at the person on the ground, and then saw him look around again and walk towards the drive-through area of the bank and then towards Kroger's and her store. (R. 37:213-19). On cross-examination, after confirming she did not see Petitioner fire a shot into the bank and only saw him fire one shot, Ms. Johnson was questioned about a written statement she gave to the police at the bank that day. She conceded that the written statement indicated that she told the police that she saw Petitioner fire a shot back into the glass window of the bank and then saw him fire down towards the ground once or twice. She further conceded that her statement did not indicate that she saw a person on the ground. (R. 37:224, 234-35, 237). She also testified, under questioning from defense counsel, that representatives of the district attorney's office came to the store about a week after the shooting, that they spoke to her and took some pictures in which she reenacted what she did that day, that she reviewed her statement to the police three weeks to a month before giving her testimony, and that she last met with the prosecutor about a week before her testimony. (R. 37:232-33). On re-direct examination, Ms. Johnson testified that, four days after the offense, she told a detective with the Garland police department that she saw the person shoot at a downward angel at a body on the ground. (R. 37:238). Defense counsel did not object to this testimony given on re-

15

direct examination.  Rather, on re-cross examination, defense counsel asked Ms. Johnson if the

Garland police took another written statement from her.  She responded that they did not.  He then

asked her if she asked to correct her written statement, and she responded that she did not, but she

wanted to and she should have. (R. 37:240-41).

Under Texas Rule of Evidence 801(e)(1)(B), a prior consistent statement is not considered

to be inadmissible hearsay, but is rather an exception to the hearsay rule, if it is offered to rebut

either an express or implied charge against a declarant of recent fabrication or improper influence

or motive. *See* TEX R. EVID. 801(e)(1)(B).  In *Tome v. United States*, 513 U.S. 150, 167 (1995), a

Supreme Court case that analyzes the identical hearsay exception contained in the federal rules of

evidence, the Supreme Court held that a prior out-of-court consistent statement may be admitted into

evidence in order to rebut a charge of fabrication or improper influence or motive only if the prior

consistent statement was made prior to the charged recent fabrication or improper influence or

motive.  Texas state law is the same. *See Haughton v. State*, 805 S.W.2d 405 (Tex. Crim. App.

1991).

In addressing this ground for relief, the state habeas court found that, based on defense

counsel's questions to Ms. Johnson about when she met with prosecutors or their staff, defense

counsel implied that her testimony was colored by this contact.  The Court further found that the

witness gave her prior consistent statement to the Garland police before her first meeting with

prosecutors.  Accordingly, the Court concluded that her prior consistent statement was admissible

and defense counsel was therefore not ineffective for failing to object to its admission. (SHTr.

II:500-01).  These findings and conclusions were adopted by the Court of Criminal Appeals.

The state habeas court's decision is not contrary to federal law and did not involve an unreasonable application of federal law.  Petitioner contends that the witness's prior consistent statement was inadmissible bolstering testimony because defense counsel did not impeach Ms. Johnson on her testimony that she saw Petitioner shoot towards the ground, but rather impeached her regarding other parts of her testimony which differed from her written statement to the police. But, as Petitioner notes, in *Tome v. United States*, the Supreme Court emphasized that the relevant hearsay exception exists so that a party may rebut an alleged motive. *Id*. at 157-58.  In the instant case, the state habeas court found that defense counsel had implied a motive for fabrication by asking Ms. Johnson several questions about when she met with representative of the District Attorney's office.  This is not an unreasonable determination of the facts based on the record from the trial.  Accordingly, the State was entitled to rebut defense counsel's implication that Ms. Johnson changed her story after meeting with prosecutors by presenting a prior consistent statement like Ms. Johnson's oral statement to the police, which pre-dated any meeting she had with prosecutors. Petitioner's sixth ground for relief is without merit, and it is recommended that it be denied.

3.      Hearsay Evidence claim

In his seventh ground for relief, Petitioner asserts that he was denied effective assistance of counsel at the guilt phase of the trial because his trial counsel placed into evidence reports and notes from an expert witness which contained hearsay without first requesting a limiting instruction that they be considered solely for impeachment purposes.  Specifically, Petitioner complains that his trial counsel were ineffective for placing into evidence reports and notes generated by Vicki Hall, the State's trace evidence analyst.  In response, Respondent argues that trial counsel had a valid strategic reason for having the reports and notes admitted into evidence without requesting a limiting

17

instruction and that Petitioner has failed to establish any prejudice because the contents of the admitted evidence was already before the jury through Ms. Hall's testimony and because her testimony was adequately impeached by trial counsel.

Vicki Hall testified as an expert witness for the State at Petitioner's trial.  She testified, among other things, that she performed testing on the clothing of the victim in an effort to determine the distance from which the shots were fired.  On direct examination, she testified that, based on the absence of gunpowder residue and the fact that there were only two gunpowder particles near the defect at the center of the shirt, she determined that the shot to the center of the victim's chest was fired from a distance greater than one foot way and most likely as far away as three or four feet. (R. 39:117-20, 139-40).  On cross-examination, defense counsel had admitted into evidence "every piece of paper" that Ms. Hall had generated with regard to the instant case. (R. 39:147).  Later, on cross-examination, Ms. Hall acknowledged that the only written report she made, dated February 27th, states that the range of fire could not be estimated on the shot to the center chest due to the possibility of overlapping residue patterns from other defects on the shirt. (R. 39:148-49).  She further stated that her opinion had not changed since writing the report, but her conclusion changed because she felt more confident in making a firmer decision on the range of fire after meeting with the medical examiner and her supervisor. (R. 39:150-51).  She acknowledged that she did not generate a new report with this change and that none of the her notes reflected this change. (R. 39:152-53).  She further testified that she did not initially make an estimate on the range of fire of the shot to the victim's center chest because she did not think that it would be a significant issue in the case.  (R. 39:156-57).  She also acknowledged that, prior to testifying, she was informed by the prosecutors that there was a witness who would testify that the suspect shot the officer while he was

lying on the ground.  Hall, however, maintained that she was not told this testimony until after the estimate on the range of fire had been made. (R. 39:159, 164).  She acknowledged, however, that her notes did not contain any information about when that estimate was made, nor when any meetings she had with the prosecutors or her co-workers took place. (R. 39:164-65).  She also acknowledged that there were no test-firings done beyond twelve inches from the fabric. (R. 39:172).

At the state habeas level, an affidavit from defense counsel Jim Oatman was submitted with the state's response.  In this affidavit, Mr. Oatman stated that he wanted all notes made by Ms. Hall placed into evidence in order to show that her trial testimony regarding the range of fire on the one shot was not contained in any of the written material.  He explained that he did not request an instruction limiting the use of the report to impeachment, rather than having it admitted for all purposes, because in his opinion juries do not typically understand the difference between impeachment and substantive evidence and might believe that counsel was trying to hide something if informed that it was admitted for only a limited purpose.  He further stated that he believed that his strategy in having the notes and report admitted was effective because the prosecutors did not mention Vicki Hall's testimony at all during closing statements. (SHTr. I:289-90).

The state habeas court found the affidavit by trial counsel to be trustworthy and found entering the documents into evidence without requesting a limiting instruction to be a reasonable trial strategy, noting that the prosecutors did not mention Ms. Hall's testimony during closing arguments.  The state habeas court therefore concluded that trial counsel was not ineffective in this regard.  And, after finding that the contents of Ms. Hall's report were already before the jury through

her testimony on direct examination, the state habeas court concluded that the prejudice prong of *Strickland* had not been proven. (SHTr. II:504-05).

The state habeas court's conclusions do not involve an unreasonable application of the *Strickland* standard.  While Petitioner questions Mr. Oatman's strategy of admitting the documents without a limiting instruction, his affidavit reflects that it was a trial strategy made after some consideration.   And, it has not been shown that the strategy was so ill-chosen that it permeated Petitioner's trial with obvious unfairness, especially as the prosecutors did not utilize Ms. Hall's testimony at all during closing statements, indicating that Mr. Oatman's impeachment of her testimony was effective.   (*See* R. 42:121-136, 157-169).   Accordingly, it does not constitute ineffective assistance of counsel. *See Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997). Moreover, no prejudice has been shown, given that Ms. Hall had already testified in detail to what was contained in the documents.  Petitioner's seventh ground for relief is without merit, and it is recommended that it be denied.

4.      DNA Testing claim

In his eighth ground for relief, Petitioner asserts that his trial counsel were ineffective for failing to obtain DNA testing on a bullet found at the scene.  In particular, Petitioner contends that his trial counsel was ineffective for failing to have DNA testing performed on a bullet recovered from a file cabinet inside of the bank.  Petitioner argues that, had counsel done so and had no blood or other genetic material from Officer Moore been found on the bullet, this would have supported the defense theory that the bullet fired into the bank from Petitioner's gun did not strike Officer Moore's finger, as suggested by the State.  This, in turn, would support the defense theory that all of the bullets that struck Officer Moore were fired at close range, but the one that struck him in the

center of his chest hit his finger first, thus explaining why there was little gunshot residue around that wound.

At trial, the State presented some eyewitness and expert testimony in support of a theory that Petitioner shot the victim one final time when the victim was lying on the ground and Petitioner stood over him.  As noted earlier, Brandy Johnson testified that she saw the shooter shoot towards the ground and Vicki Hall testified that, in her opinion, the shot to the center of the victim's chest was fired from a distance of greater than one foot and most likely from three or four feet.  Also noted earlier, the defense countered this theory by vigorously cross-examining Ms. Johnson and Ms. Hall. Furthermore, defense counsel presented testimony from their own expert, Timothy Fallon, the crime lab supervisor for Bexar County.  He testified that, after reviewing the report and notes generated by Ms. Hall, the autopsy report, and the victim's shirt, in his opinion there was most likely an interposed target that the bullet hit before reaching the victim's chest, which explains why there was gunshot residue found on one side of the hole in the shirt, but not on the other side.  He further testified that, considering the gunshot wound to the victim's right index finger, the evidence was consistent with the finger being the intervening target. (R. 42:11-17).

The state habeas court concluded that Petitioner had failed to prove that his attorneys were ineffective for failing to request DNA testing on the bullet at issue and concluded that Petitioner had failed to proof that there was a reasonable probability that the result of the trial would have been different had the testing been done. (SHTr. II:508).  These conclusions were adopted by the Court of Criminal Appeals.  The state habeas court's conclusions do not result in a decision that is contrary to the clearly established federal law of the *Strickland v. Washington* standard.

This Court would note initially that, even had defense counsel had the bullet in question tested and no DNA was revealed, this evidence may have been of limited value, given that prior to any testing, the bullet had already traveled through a wall and the back of a filing cabinet before landing at the bottom of the cabinet drawer.[1]  But, more importantly, Petitioner has failed to establish prejudice. As noted earlier, while the State did present some evidence that one of the bullets that hit the victim was fired from a further distance than the others, this was not the crux of the State's case.  Instead, in their closing statements,  the prosecutors argued that the evidence showed that Petitioner intentionally or knowingly killed the victim by emphasizing that: 1) Officer Moore was shot four times, resulting in five wounds, including three in the chest and once in the arm; 2) even defense witness Jasper Mallard testified that Petitioner shot the officer several times while standing, as the officer fell to the ground; 3) the trigger pull on Petitioner's semi-automatic weapon required that he apply considerable pressure to fire the weapon each of those times; 4) Petitioner's story that he took the loaded gun into the bank because he did not want it to be stolen, took the gun out to give it to the officer, and did not know either that his gun had been fired several times or that the officer had been shot was not credible; and 5) it did not matter to the State's case whether Petitioner shot the officer from a distance or from up close or whether the victim was shot first while in the bank or while outside. (R. 42:126-27, 158-64).

Accordingly, given the evidence presented at trial to support Petitioner's conviction for intentionally or knowingly killing a police officer, Petitioner has not shown that, had the bullet from the inside of the filing cabinet been tested for DNA *and* no DNA from the officer was retrieved from

---

[1]
The bullet was in good enough condition, however, that the firearm examiner Robert Poole was able to determine that it was fired from Petitioner's gun. (R. 40:70-1).

that bullet, there is a reasonable probability that he would not have been convicted of capital murder. Petitioner's eighth ground for relief is without merit, and it is recommended that it be denied.

5.      Mitigating Evidence claims

In his first and second grounds for relief, Petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel at the punishment phase of the trial because his trial counsel failed to conduct a meaningful investigation into possible mitigating evidence and failed to introduce available mitigating evidence.  Specifically, Petitioner asserts that, had his attorneys investigated further, they would have uncovered evidence that Petitioner suffers from "frontal lobe impairment and diffuse brain injury" and that he also suffers from major depression. And, Petitioner argues that his trial counsel were ineffective for choosing not to present mitigating evidence that was available to them, including evidence that Petitioner is a loving father and husband, that he grew up very poor in a physically violent and chaotic household, that he attempted to battle his drug addiction by voluntarily attending five rehabilitation programs, and that as a result of his addiction he became isolated from society.

*Applicable Facts*

Evidence Presented at Punishment Phase

At the punishment phase of the trial, the State presented evidence through the testimony of L'Shun Armstrong that Petitioner sexually assaulted Armstrong in 1985 at his apartment.  Armstrong further testified that she later escaped from the apartment, called 911, was examined at the hospital, and filed a sexual assault case.  She acknowledged on cross-examination that the grand jury declined to indict Petitioner. (R. 43:12-23, 34).  The State also presented evidence that Petitioner was arrested in 1985 for possession of marijuana and possession of Chinese throwing stars, classified as an illegal

23

knife, and that Petitioner was arrested in November of 1996 for stealing merchandise from Home Depot and returning the merchandise for cash refunds. (R. 43:56-59, 71-90,102-110).   Further evidence was presented that, from November of 1996 through January of 1997, Petitioner received cash refunds from various Home Depot stores totaling over $6500.00. (R. 43:116-21).   The State also presented evidence that Petitioner robbed the same Bank One on January 9, 1997, by using a note stating that he had a gun (R. 43:128-31), and that Petitioner entered that same bank on January 22, 1997, and police were notified, but Petitioner left before they arrived. (R. 43:132-35).   The State also presented evidence that, on February 9, 1997, Petitioner robbed a Home Depot at gunpoint (R. 43:152-60).[2]  Finally, several sheriff's department employees testified that Petitioner would scream and make noise in the holding area until he was taken back to the main jail, and Petitioner referred to several guards as Uncle Toms and punks, threw a food tray at a guard, and told this same guard that it would make his day to kill another cop and that a cop is lower than a "fucking earthworm." (R.44:48-54, 59-60, 64-5, 68-9).

The defense presented evidence that, after Petitioner was arrested after shooting Officer Moore and was being transferred to the hospital because he had been shot in the hand by the arresting officer, Petitioner complained about his hand, but then stated that he felt bad about the officer and felt worse about the officer than he did about himself.  And, when Petitioner learned that the officer had died, he mumbled, "oh, God, oh Jesus." (R. 44:8-9).  The defense also presented the testimony of Larry Ericson, a gentleman who had worked with Petitioner at Coca-Cola for fifteen years.  Ericson testified that he knew Petitioner very well, that he came to know Petitioner's wife

---

[2]

There had also been evidence presented at the guilt phase of the trial by the State on rebuttal that, on February 10, 1997, Petitioner robbed a Wendy's where he used to work at gunpoint. (R. 42:68-99).

and child through those years, and that they were the same religion as himself.  Ericson also testified

that Petitioner held responsible positions in the company, had a reputation as a hard worker and

received promotions and recommendations, but lost his job due to drug abuse.  Ericson testified that

Petitioner lived with him for a couple of weeks when he had had an argument with his wife, that

Ericson knew that Petitioner had a problem with drugs, and that Petitioner attended drug treatment

programs while working for Coca-Cola.  Ericson also testified that Petitioner loved his child very

much and showed it, and that Petitioner's drug abuse caused him to be disfellowshipped from his

church.  Finally, Ericson testified that the man he knew for fifteen years was not the one who

committed the murder and other aggravated robberies and that he had not been an animalistic person

all of his life.  Rather, Ericson opined that cocaine had been the cause of Petitioner's downfall in life.

(R. 44:11-19, 23-4).

Finally, defense counsel Oatman called Petitioner to testify on his own behalf, after having

Petitioner acknowledge on the record that both defense attorneys and the defense investigator had

tried to dissuade him from testifying because they did not believe it was in his best interest.  (R.

44:73).  In his testimony, Petitioner explained that he did make some statements to jailers after the

verdict because he was upset and because there had been problems at the jail where he would be left

in the holdings cell for hours, problems with him receiving his meals, and problems with him being

given his high blood pressure medication.  Petitioner then began to testify to his version of events

at the bank and the fact that he disagreed with the verdict.  Petitioner's testimony ended when he

said, "[s]o to all of you people, I say fuck you in your ass.  You can kiss my mother fucking ass.  I

didn't do what you said.  Fuck ya'll."  The jury was escorted from the courtroom at that time and

the parties proceeded to discuss the jury charge before beginning closing arguments.  (R. 44:75-81).

State Habeas Court Proceedings

As support for these claims, at the state habeas level, Petitioner presented the following evidence: 1) a neuropsychological evaluation from Dr. Ethel Hetrick, a psychologist who examined Petitioner on July 13, 2000, and conducted neuropsychological tests at that time; 2) affidavits from two of Petitioner's brothers and his mother; 3) an affidavit from Dr. Paula Lundberg-Love, a psychologist, rendering an opinion based on her review of Dr. Hetrick's evaluation, the affidavits from family members, and scientific articles; 4) an affidavit from investigator Tena Francis; 5) an affidavit from Dr. Jaye Crowder, a forensic psychiatrist who examined Petitioner prior to trial and who recalls recommending that neuropsychological testing be performed on Petitioner; and 6) a note signed by Dr. James Hassell, stating that he received a call from Dr. Crowder on October 22, 1997, after Petitioner's trial ended, about the possibility of conducting neuropsychological testing on Petitioner, but Petitioner had already been transferred to prison on October 20, 1997. (SHTr. I:115-157).

In particular, in her report, Dr. Hetrick stated that she conducted several neuropsychological tests on Petitioner and determined that he suffers from frontal lobe dysfunction.  She reported that, in tests involving more structure, Petitioner's results were in the normal range.  But, Petitioner showed a deficit on the Wisconsin Card Sorting test where he performed below the first percentile for his age.  Dr. Hetrick further stated in the report that this card sorting test is reported in neuropsychological literature as the most sensitive to the functioning of the frontal lobe. (SHTr. I:118-120).

With regard to the affidavits from Petitioner's family members, his older brother Curley Mosley stated in his affidavit that their father was physically abusive to their mother, that the

26

children were beaten by the father, that the family were laborers on various farms during his childhood, and that the family was very poor. He recalled seeing drums and barrels of pesticides on the farms, and the children would play around the drums and work around them in the fields. He further stated that he does not know the names of the pesticides, but the residue would remain on the cotton fields where they worked. He also stated that he spoke to one of Petitioner's attorneys prior to trial, but was not asked questions about their childhood. (SHTr. I:147-48). In his affidavit, Petitioner's older brother Robert Alford stated that when the family would pick cotton and soybeans, both their house and the crops were sprayed with pesticides, including DDT, Methal Parathion, and Toxaphene. Alford also stated that he suffered headaches as a child and that he never spoke to Petitioner's attorneys, but would have told them this information and was willing to testify. (SHTr. I:155-56). In her affidavit, Petitioner's mother Princella Mosley stated that Petitioner was diagnosed as having a large heart when he was an infant, the family worked in fields where the planes would spray pesticides on their house and the fields, Petitioner was a good, dependable, and trustworthy child, and Petitioner graduated high school and attended one year of college. She further stated that Petitioner's behavior changed after he married and they did not see him as often, Petitioner and his wife were very involved in their religion, she first became aware of Petitioner's drug use in 1991 when Petitioner told his father that he had scars from being beaten by drug dealers, and she wished she had been called as a witness at trial. (SHTr. I:151-53).

Regarding the affidavit submitted by Dr. Lundberg-Love, Dr. Love stated that, in her opinion, the results of the neuropsychological testing conducted by Dr. Hetrick strongly support Hetrick's assessment that Petitioner has frontal lobe impairment and that such impairment would explain Petitioner's poor impulse control, his problems with attention and concentration, and his

difficulty in inhibiting inappropriate behavior. She also opined that this impairment is "likely" not from his cocaine use, because brain damage from cocaine abuse is typically more diffuse. Instead, she stated her belief that it is more likely that Petitioner's impairment was either congenital or caused by trauma to the head. With regard to the reports by family members that Petitioner was exposed to pesticides when he was younger, Dr. Lundberg-Love stated that exposure to pesticides has been shown to induce subcortical brain impairment and the existence of such additional impairment could be determined by conducting a SPECT scan on Petitioner. (SHTr. I:122-28).

In her affidavit, Tena Francis stated that, through interviewing various witnesses, she determined that Petitioner's family lived on several farms in Arkansas from 1961 through 1971 and the entire family continued to work as laborers on farms through 1979. She further learned that these farms were sprayed with chemicals by airplane and on the ground and that, according to a professor from the University of Arkansas she spoke to, the most likely pesticides used during that time would have been DDT, Toxaphene, and Methyl Parathion, with DDT now no longer being used on crops because of health risks. (SHTr. I:158-60).

Dr. Jaye Crowder submitted an affidavit stating that he is a forensic psychiatrist who was retained by defense attorney Wayne Huff to examine Petitioner. He further stated that, while his memory of events is imperfect, as best as he can recall, he advised counsel after interviewing Petitioner that Petitioner should receive neuropsychological testing in order to determine if Petitioner suffered damage to his central nervous system as a result of his long-term cocaine abuse. He further stated that, to the best of his memory, about one week prior to trial, he and Mr. Huff realized that the arrangements to have this testing had not been made, as each believed that the other would make the arrangements. Dr. Crowder further stated that he spoke to Mr. Huff after trial about

28

testing, but was told that Huff believed it was too late at that time.  Crowder attempted to arrange testing to be performed by an intern at the medical school was he is employed, but Petitioner had already been transferred to death row. (SHTr. II:331-32).

In response, Respondent submitted affidavits from Petitioner's two trial attorneys, Jim Oatman and Wayne Huff, and from defense investigator Cliff Jenkins.  Respondent also submitted Petitioner's college transcript from the University of Arkansas at Monticello, reflecting that he received primarily Bs and Cs during the one year he attended that institution (SHTr. I:309), and TDCJ records reflecting that, during his initial death row assessment, Petitioner reported that he did not have any kind of mental or emotional problem, Petitioner stated that he had never received psychiatric treatment, and Petitioner showed no symptoms or signs of a mental disorder. (SHTr. I:300-06).  In his affidavit, Mr. Oatman stated that, in preparation for trial, he spoke extensively with Petitioner, who did not mention any history of mental illness, head injuries, or brain damage.  He also stated that he reviewed Petitioner's medical records and that these reflected treatment for drug addiction, not a history of mental illness or brain damage.  Mr. Oatman also stated that he spoke to members of Petitioner's family, including his mother, one of his brothers, and his wife, and that he asked open-ended questions that were designed to elicit their opinions as to why Petitioner committed the crimes and what his problems were.  All of them believed that his problems were caused by his drug use and did not mention any history of mental illness.  And, while he was aware that Petitioner's father would "whip" the children, Oatman did not believe that this would constitute effective mitigating evidence as there was no indication that Petitioner was severely abused.  Finally, Oatman stated in his affidavit that Petitioner refused to allow counsel to call any family members as witnesses at the punishment phase of the trial and threatened to disrupt the proceedings if they

did, so counsel instead called a friend of Petitioner to testify about the effect drugs had on Petitioner's life. (SHTr. I:290-92).

Mr. Huff stated in his affidavit that it was his recollection that Dr. Crowder examined Petitioner in August of 1997 and that Crowder told Huff in subsequent conversations that he should not be called as a witness because his testimony would do more harm than good.  Huff concurred with this opinion because Crowder essentially stated that there was nothing wrong with Petitioner other than his drug use.  Huff further stated in his affidavit that he does not recall Crowder contacting him about the possibility of conducting neuropsychological testing on Petitioner and, had he done so, Huff would have requested funds for such testing as has been his practice in the past when he has retained Crowder.  Finally, Huff stated that he does recall Crowder contacting him after Petitioner's trial after Crowder read an article about an outburst Petitioner had in the courtroom because Crowder was concerned about impulsive behavior on Petitioner's part.  In this conversation, Crowder first mentioned performing additional testing on Petitioner. (SHTr. I:294-95).

Finally, in his affidavit, Cliff Jenkins states that, as the defense investigator, he subpoenaed Petitioner's medical records from various hospitals and rehabilitation centers where he had been treated.  He further stated that he interviewed Petitioner's mother, his niece Lynette Hollinshed, one of his brothers, Curly, and David Sublett [sic], one of his counselors.  He specifically recalled asking if Petitioner had any physical or mental problems and the only medical problem that was mentioned was that he had an enlarged heart. (SHTr. I:297-98).

<u>Federal Habeas Proceedings</u>

Petitioner has submitted the following additional evidence to this Court that was not presented at the state level: 1) an affidavit from Petitioner; 2) records from the high school Petitioner

attended; 3) a second affidavit from Dr. Jaye Crowder; 3) an affidavit and report from Dr. Emily Fallis, a psychologist who examined Petitioner on October 29 and November 19, 2004; and 4) an affidavit from state habeas counsel, Gary Hart.

In his affidavit, Petitioner attests that, had his trial attorneys read his medical records, they would have learned that he informed medical personnel at both Charter Hospital and Presbyterian Hospital of Plano that he grew up in a violent and chaotic household, where his mother and the children were beaten by his father. Petitioner also states that he was exposed to chemicals and pesticides for a number of years when he family worked in cotton fields and that he began using drugs during his early teenage years, with one of his brothers first introducing him to marijuana, but his attorneys did not hire an expert to explain the long-term effects of drug use on a person. Petitioner also asserts that his trial attorneys failed to investigate medical records that indicated that he voluntarily entered in-treatment residential drug treatment programs several times. Petitioner also states in his affidavit that, although his attorneys did talk to him about some of his medical records and some of the personal things that these records revealed, they did not discuss with him his history of depression, his violent childhood, or the fact that he grew up in a segregated area or that he lived on a farm where pesticides were sprayed. (Petitioner's Ex. #5).

Petitioner's high school records indicate that he graduated from high school in 1976, ranked sixty-fifth out of a class of 139. They further reflect that Petitioner occasionally made A's, D's and F's in classes, but mainly made either B's or C's in his classes. (Petitioner's Ex. #4).

In his second affidavit, Dr. Crowder states that he advised trial counsel in a letter dated September 23, 1997, that counsel would be better served presenting evidence regarding how cocaine use affects impulse control and aggression levels through an expert who had not examined

Petitioner.  His letter further stated that, if appropriate, this expert could also testify on the issue of future dangerousness, with lay witnesses testifying about Petitioner's history.  Also in this letter, Dr. Crowder stated that he advised counsel that an investigator would need to establish abuse or deprivation in Petitioner's past, as Petitioner himself had described a harsh, "but not overwhelmingly oppressive childhood." (Petitioner's Ex. #11).

In her affidavit and report, Dr. Fallis states that she examined Petitioner on two different states and administered several tests, including an intelligence test, personality tests, a memory test, and a neuropsychological assessment.  She also reviewed the affidavits and reports previously submitted in the case and scholarly articles regarding neurotoxicity.  She determined that Petitioner was of average intelligence, demonstrated a normal range of emotion, and exhibited no psychosis. She further determined that the neuropsychological assessment revealed that Petitioner had some generalized brain impairment, including attention deficits similar to Attention Deficit Disorder (ADHD), some motor deficits in the mouth and tongue area, difficulty with sequential movements, auditory processing deficits, difficulty with nonverbal reasoning, and memory limitations.  Dr. Fallis further stated that, while it is possible that some or all of the deficits noted in Petitioner's test results are the result of substance abuse, she believed that the more probable cause was exposure to toxic chemicals because the damage was diffuse, rather than localized, and research has shown that exposure to pesticides results in deficits similar to ADHD.  She further states that his substance abuse also may have caused brain damage or may have exacerbated preexisting deficits.  Dr. Fallis also theorizes that Petitioner may have been self-medicating his atttentional and other brain impairments, as well as the depression that was reported by drug treatment programs, when he abused cocaine. (Petitioner's Ex. #15 & 16).

In his affidavit, state habeas counsel Gary Hart states that he contacted Jim Oatman and Wayne Huff and was told by Oatman that he had given all of his files in the case to Huff. Wayne Huff told him that he had lost all of the files in the case. (Petitioner's Ex. #17).

*Applicable Law*

The Fifth Circuit has held that, if counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*, 540 U.S. 11865 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002). The Supreme Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

The Fifth Circuit has also recognized that "[g]reat deference must be given to choices which are made under the explicit direction of the client." *United States v. Masat*, 896 F.3d 88, 92 (5th Cir. 1990), *citing Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987). In *Strickland*, the Supreme Court stated that:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

466 U.S. at 691.

Recently, in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard,* 125 S.Ct. 2456 (2005)*,* the Supreme Court applied the *Strickland* standard in cases where the claim was made that counsel was ineffective by failing to investigate, and then present, potentially mitigating evidence.  The Court in *Wiggins* determined that the appropriate question was whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was a reasonable decision. *Id.* at 522-23.  Under the *Strickland* standard, a determination must be made regarding whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence. *Id.*  This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*  In *Wiggins*, the Court determined that trial counsel were ineffective for failing to investigate potential mitigating evidence beyond a series of tests conducted on Wiggins by a psychologist, a written pre-sentence investigation report, and records from the Department of Social Services (DSS). *Id.* at 523-24. Furthermore, the Court held that Wiggins had been prejudiced by this failure because, had counsel had a social history report prepared and/or followed up on the information contained in the DSS records, counsel would have uncovered and been able to present evidence that Wiggins suffered from severe deprivation and abuse at the hands of an alcoholic mother and physical and sexual abuse during subsequent foster care, and there was a reasonable probability that the jury, confronted with this evidence, would have returned a different verdict at sentencing. *Id.* at  524-25, 534-36..

Then, in *Rompilla*, the Supreme Court held that trial counsel were ineffective for failing to examine the court's file about a prior conviction Rompilla received for rape and assault in order to prepare to represent Rompilla at the sentencing phase of his capital murder trial, as defense counsel

was on notice that the State intended to present evidence of this prior conviction in its attempt to

seek the death penalty against Rompilla. 125 S.Ct. at 2463-64.  The Supreme Court then held that,

had counsel viewed this court file, counsel would have discovered "mitigation leads" from the prison

files, which indicated that Rompilla's history was very different from what Rompilla and his family

had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol

abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well

as a low level of cognition. *Id*. at 2468.  Then, had counsel pursued these leads, counsel would have

discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla

was frequently physically abused by his father, and Rompilla suffered from organic brain damage

and significantly impaired cognitive function. *Id*. at 2468-69.  The Court concluded that Rompilla

was prejudiced by this failure because there was a reasonable probability that he would not have

been sentenced to death had the jury heard this evidence. *Id*. at 2469.

*State Court Findings and Conclusions*

When it addressed the claims that trial counsel was ineffective in their investigation and

presentation of potential mitigating evidence, the state habeas court found that defense counsel's

strategy at the punishment phase of the trial was to show that Petitioner would not be a future danger

because he was only dangerous when he was taking drugs.  As support for this theory, defense

counsel called a former co-worker of Petitioner's and emphasized in closing arguments the absence

of violent crimes in Petitioner's past.  (SHTr. II:527).  The state habeas court, being familiar with

trial attorneys Jim Oatman and Wayne Huff, as well as defense investigator Cliff Jenkins, found

them to be credible witnesses and accepted the statements in their affidavits as true and correct.

With regard to Dr. Crowder's affidavit, the state habeas court found that he is a credible person

generally, but that his affidavit was not persuasive because he admitted that his recollection of events was imperfect and because the statements in the affidavit did not appear to be based on a review of his file. (SHTr. II:532-33). That court also found that, to the extent that Petitioner was complaining of his attorneys' failure to call his family members as witnesses, he himself dictated that choice. That court further found that the affidavits from Petitioner's family members do not establish that trial counsel conducted an unreasonable investigation because both Princella and Curly Mosley confirm that counsel contacted them while investigating the case. Therefore, based on the affidavits of the defense attorneys and investigators, as well as the affidavits of Princella and Curly Mosley, the state habeas court found that trial counsel investigated Petitioner's childhood, and his medical condition by interviewing Petitioner, his wife, his mother, his brother, his niece, his counselor, and his acquaintances. The court also found, based upon the affidavits of defense counsel and Dr. Crowder, that counsel investigated Petitioner's mental condition by having a board certified psychiatrist conduct a psychiatric evaluation of Petitioner. (SHTr. II:533-34). The state habeas court then found that Petitioner had failed to show that evidence of any frontal lobe impairment was readily available to Petitioner's trial counsel, as the evidence indicated that Dr. Crowder reported no findings inconsistent with drug use, Petitioner's family members emphasized Petitioner's drug use as the source of his problems and did not mention any history of mental illness, Petitioner never mentioned any history of mental illness, and Petitioner's medical records revealed no history of mental illness or brain damage. (SHTr. II:534).

With regard to the affidavits and report submitted by Dr. Hetrick, the state habeas court found them to be unpersuasive because Dr. Hetrick's conclusion that Petitioner suffers from frontal lobe impairment due to pesticides appears to be at odds with his performance on a majority of tests

given to him, none of his family members reported that either Petitioner or other family members reported any symptoms of frontal lobe impairment, and Dr. Hetrick's conclusion appeared to be unduly influenced by the fact that Petitioner was very upset that he might miss a meal while she was testing him. (SHTr. II:539).  The state habeas court found Dr. Lundberg-Love's affidavit to be unpersuasive because she relied upon Hetrick's report, her conclusion that Petitioner's impairment was due to a head trauma or congenital defect was unsupported by his medical history or affidavits from family members, and she admits in her affidavit that scant data exists concerning the effects of repeated exposure to pesticides. (SHTr. II:539-40).  The state habeas court further found that the symptoms of frontal lobe impairment described by Lundberg-Love such as poor impulse control and explosiveness could have been a double-edged sword if such evidence was presented to the jury, as it could also be used as evidence of Petitioner's future dangerousness. (SHTr. II:540).

The state habeas court then concluded that trial counsels' investigation of Petitioner's background and mental status was a reasonable one and that trial counsel's strategy of presenting evidence that Petitioner was not a future danger because he was only dangerous when taking drugs was a reasonable strategy made after an evaluation of the facts and available evidence. (SHTr. II:536, 542).  That Court further concluded that Petitioner had failed to establish prejudice under the *Strickland* standard for counsel's failure to present evidence of possible brain impairment, after finding that the evidence of brain impairment was weak and contradictory, that the effects from this any brain impairment were relatively minor, that such evidence could be used by the prosecution to help show future dangerousness. (SHTr. II:539-42).  Accordingly, the state habeas court concluded that Petitioner had failed to prove any ineffective assistance of counsel in this regard. (SHTr. II:542).

*Analysis*

<u>Failure to Investigate Potential Evidence</u>

Petitioner first contends that his trial counsel were ineffective for failing to conduct an adequate investigation into potentially mitigating evidence.  Petitioner alleges that, had his trial attorneys sought his past medical history, they would have discovered his history of major depression that responded well to medication but he attempted to "self-medicate" with cocaine and that, had they obtained the neuropsychological testing that was allegedly recommended prior to trial by the psychiatrist who did examine Petitioner, they would have discovered that Petitioner suffers from frontal lobe impairment and diffuse brain injury.  Then, had defense counsel adequately questioned Petitioner's family members, they would have discovered that Petitioner had had childhood exposure to pesticides that likely caused this impairment, that then could have been the cause of his violent and explosive behavior.  Petitioner further contends that, had his trial attorneys investigated, discovered, and presented this evidence, rather than relying solely on testimony that Petitioner's problems had been caused by his drug use, there is a reasonable probability that he would not have been sentenced to death.

Initially, Respondent responds by arguing that the additional evidence Petitioner presents to this Court that was not presented to the state habeas court is unexhausted. *See Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996) (stating that a habeas petitioner fails to exhaust state court remedies when he presents materially additional evidentiary support in federal court that was not presented to the state court); *but see Anderson v. Johnson*, 338 F.3d 382, 388-89 (5th Cir. 2003) (holding that a petitioner has not failed to exhaust a claim where new evidence is presented to the federal court

38

where the new evidence supplements and does not fundamentally alter the claim.)  Accordingly, Respondent argues that this new evidence should not be considered by this Court.

Without making a determination as to whether this additional evidence either fundamentally alters or merely supplements these two claims, this Court will consider the new evidence.  But, even considering the additional evidence, Petitioner is not entitled to relief on this claim.  In particular, Petitioner contends that, had defense counsel reviewed his medical records, they would have discovered and presented evidence of Petitioner's major depression.  Petitioner further argues that, had defense counsel had neuropsychological testing done, and asked Petitioner's family the right questions about their past, they would have discovered and presented evidence that Petitioner had brain damage caused by pesticide exposure and presented evidence that Petitioner's drug abuse stemmed from his depression and exposure to pesticides as Petitioner was self-medicating to combat his depression and brain impairment.

The state habeas court, however, made specific factual findings that defense counsel did review Petitioner's medical records, did ask questions about Petitioner's family history, and had no evidence before it of any brain impairment, as they were not told before trial that neuropsychological testing was recommended, Dr. Crowder did not reports any findings inconsistent with drug use, and no history of mental illness or brain damage was reported by either Petitioner or his family members. Petitioner disputes these findings, arguing that Dr. Crowder's two affidavits and the note from Dr. Hassell are evidence that Dr. Crowder recommended to defense counsel prior to trial that neuropsychological testing should be performed and that, the fact that one defense attorney is now deceased and the other no longer has the files from this case undercuts their affidavits.  Furthermore, Petitioner contends that, because Petitioner's medical records do not contain a copy of a subpoena

from defense counsel but do contain one from a prosecutor, the evidence before this Court is that defense counsel did not review Petitioner's medical records.  And, Petitioner contends that the affidavits from Petitioner's mother and two brothers is evidence that trial counsel did not question them in an adequate manner.

But, in a federal habeas proceeding, any factual finding made by a state court must be presumed to be correct, with a petitioner having the burden of rebutting this presumption with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  Petitioner has presented no such clear and convincing evidence.  With regard to any recommendation from Dr. Crowder to have further testing performed on Petitioner, even when both of Dr. Crowder's affidavits and the note from Dr. Hassell are considered, the available evidence before this Court is that, prior to trial, Crowder recommended to trial counsel by letter that another expert be retained *who had not examined Petitioner* to testify at trial and that Crowder contacted Hassell after trial regarding further testing.  Otherwise, Wayne Huff's and Dr. Crowder's recollections on this issue differ.  And the trial court, confronted with this difference in recollection, found Mr. Huff's recollection to be the more persuasive one.  Petitioner has not presented clear and convincing evidence to the contrary.  Instead, Dr. Crowder's new affidavit appears to lend support to Mr. Huff's recollection as, in this affidavit, Crowder quotes from a letter he sent to Huff prior to trial that mentions nothing about the need for neurological testing.

With regard to the issue of Petitioner's medical records, both Cliff Jenkins and Jim Oatman state in their affidavits that the defense had Petitioner's medical records in their possession and reviewed them.  Indeed, Mr. Jenkins states in his affidavit that he interviewed one of Petitioner's former counselors, which is further evidence that the defense investigated Petitioner's medical history, as the medical records reflect that this counselor, David Sublet, was Petitioner's counselor

40

at a drug treatment program he entered in June of 1995. (Petitioner's Ex. #18B, p. 241). Moreover, the new affidavit from Petitioner is further support for the state court's factual finding that defense counsel reviewed Petitioner's medical records, as Petitioner acknowledges in his affidavit that defense counsel asked him certain questions about his medical records and the information contained within them. Given this evidence, the absence of a copy of a subpoena from defense counsel in the copy of medical records obtained by state habeas counsel does not constitute clear and convincing evidence that defense counsel did not review Petitioner's medical records.

Not only has Petitioner failed to overcome the presumption of correctness regarding the state habeas court's findings, but Petitioner has also failed to establish that the conclusions reached by the state habeas court were an unreasonable application of federal law or were based on an unreasonable determination of the facts in light of the evidence presented at the state level. *See* 28 U.S.C. § 2254(d). The state habeas court concluded that the investigation into Petitioner's background and mental status was a reasonable investigation, after finding that the defense had Petitioner examined by a psychiatrist, questioned Petitioner and his family, and reviewed his medical records and history. Petitioner argues that, had defense counsel adequately investigated his medical records and family history, they would have discovered that he suffered from brain damage due to pesticide exposure and that he self-medicated depression with cocaine.

But, a review of Petitioner's medical records does not reveal evidence that Petitioner had a long history of major depression that he "self-medicated" with cocaine. Instead, these records indicate that, while Petitioner at one point was diagnosed with major depression in June of 1995 by Charter Hospital of Grapevine, this depression was attributed by the staff at the treatment center to Petitioner's cocaine withdrawal and his stressful life situation, as he had recently lost his job and his

41

marriage was under stress. (Pet. Ex. #18B:241). These records also reveal that he was placed on an anti-depressant during an earlier stint at this treatment center in November of 1994 because he was craving cocaine. (Pet. Ex. #18B:330). And, in fact, when Petitioner attended a treatment center in February of 1996 for cocaine dependency, this same medication for depression was initially given to Petitioner to reduce his craving for cocaine but was eliminated because it was determined that it was not benefitting Petitioner. This treatment center did not diagnose Petitioner has having depression. (Pet. Ex. #18:13-4). And, records from treatment centers Petitioner attended prior to 1994 do not indicate any diagnosis of depression. Accordingly, Petitioner has not presented evidence that, had trial counsel investigated Petitioner's medical records to a greater degree, they would have discovered evidence of Dr. Fallis's contention that Petitioner self-medicated depression with cocaine.

With regard to any history of exposure to pesticides, Petitioner has not shown that counsel was ineffective in questioning Petitioner or his family about his history. Defense counsel cannot be deemed deficient for failing to uncover information that was known to their client but that he does not reveal to them. *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (recognizing that the reasonableness of an attorney's investigation may "critically depend" on information provided by the defendant and on the defendant's own "strategic decisions" about the representation). The evidence before this Court is that defense counsel questioned Petitioner and several members of his family about the reason for his criminal behavior, and drug use was given as the reason, not pesticides. Thus, defense counsel, using their reasoned professional judgment, opted to rely on the defense that Petitioner's criminality and violence was caused by his drug use, arguing in closing arguments that this indicated that he would not be a future danger in prison (R. 44:99-101, 105-06).

And, defense counsel further used reasoned professional judgment in presenting this evidence through the only witnesses available to them.  Counsel were not deficient in their investigation into potential mitigating evidence.

Furthermore, even had counsel somehow been made aware of the evidence from the neuropsychological testing since conducted on Petitioner and the history of pesticide exposure, Petitioner has not shown that he was prejudiced because this evidence was not presented to the jury. First, any evidence that the pesticide exposure and Petitioner's brain damage were related is contradictory, with one expert believing that it is and another believing that the damage was caused by an injury to the head or a congenital defect.  And, the expert who believes that the damage was caused by pesticides also acknowledges that it is possible that Petitioner's own cocaine usage caused and/or exacerbated the damage.  Moreover, the type of damage from which Petitioner suffers has been compared to the lack of attention and impulse control found in this suffering from ADHD. And, were this damage indeed caused by pesticide exposure, Petitioner has not explained why other members of his family who were exposed to the same pesticides do not evidently have the same criminal history as Petitioner.  Accordingly, Petitioner has not shown a reasonable probability that, had the jury been presented this evidence of relatively mild brain damage, and when confronted with Petitioner's past criminal conduct and his hostile and aggressive  behavior to the jury during the punishment phase of the trial, he would not have been sentenced to death.  Petitioner is not entitled to relief on his first ground for relief, and it is recommended that it be denied.

<u>Presentation of Mitigating Evidence</u>

In his second ground for relief, Petitioner asserts that his trial attorneys were ineffective for failing to present certain mitigating evidence of which they were aware and which was readily

available. In particular, Petitioner argues that counsel were ineffective for failing to present evidence that: 1) Petitioner was a loving father and husband; 2) Petitioner grew up very poor in a physically violent and chaotic household; 3) Petitioner had voluntarily attended five in-patient drug rehabilitation programs; and 4) Petitioner's drug abuse illness resulted in him being isolated and disfellowshipped from his church. (Petition at 46-7). Petitioner contends that, had this evidence been presented to the jury, there is a reasonable probability that he would not have been sentenced to death. As noted earlier, the state habeas court concluded that defense counsel's trial strategy with regard to mitigating evidence was a reasonable one and that Petitioner had failed to prove ineffective assistance of counsel. These conclusions are neither an unreasonable application of the *Strickland* standard nor are they based on an unreasonable determination of the facts.

First, this Court notes that, through the testimony of Petitioner's co-worker, evidence was presented that Petitioner attended drug treatment programs, that he was a hard worker and a loving father, and that his drug abuse caused the loss of his job and his estrangement from his church. Accordingly, much of the evidence of which Petitioner complains was presented to the jury. To the extent that Petitioner contends that this evidence should have been presented through the testimony of others, Petitioner acknowledges in his petition that he declined to have any family members testify on his behalf at trial. While Petitioner maintains that this decision on his part does not excuse his trial counsel's decision to present only two witnesses at trial, Petitioner does not explain, however, how evidence of his childhood and marriage could have been placed into evidence if none of his family members were called. "Great deference must be given to choices which are made under the explicit direction of the client." *United States v. Masat*, 896 F.3d 88, 92 (5th Cir. 1990), *citing Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987).

Thus, trial counsel cannot be considered ineffective for failing to present evidence that Petitioner specifically did not want to present.  And, Petitioner has not shown that defense counsel's decision that evidence of Petitioner being "whipped" as a child was not sufficiently mitigating evidence that warranted being presented at trial constituted deficient performance. *See Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (noting that a failure to present evidence at trial does not constitute "deficient performance" under the *Strickland* standard if counsel could have concluded, for tactical reasons, that presenting such evidence would be unwise).

Furthermore, Petitioner has failed to establish that, had further mitigating evidence been presented, there is a reasonable probability that he would not have been sentenced to death.  In particular, Petitioner has not shown that any evidence of physical abuse in Petitioner's past so grave as to be considered mitigating evidence on a par with that discussed by the Supreme Court in *Wiggins*.  Accordingly, Petitioner has not shown that evidence of Petitioner's upbringing, introduced through some unknown witness other than any of his family members, would have altered the result of the trial.  Moreover, Petitioner has not established that further evidence of his treatment for drug abuse would have caused a difference result. Specifically, while Petitioner did voluntarily enter drug treatment programs several times, the records from these programs also reveal that Petitioner was discharged from most of these treatment centers because he failed to continue attending classes (Pet. Ex. #18B:241-42, 330, 445-52), and the experts at these centers generally agreed that his future prognosis was poor because he had little insight into his problems and declined to continue in the programs even after being contacted by employees there. (Pet. Ex. #18B:247, 292, 330, 481).  Given this evidence of Petitioner's poor performance at these centers, Petitioner has not shown that more specific evidence of this treatment would have resulted in a life, rather than a death sentence.

45

In summary, given the limited options presented to defense counsel regarding available witnesses to call on Petitioner's behalf, and given the evidence presented at the punishment phase of the trial by the State regarding Petitioner's criminal history and Petitioner's own expletive-laced screaming diatribe to the jury during his own testimony, Petitioner has failed to establish either deficient performance of counsel or prejudice under the *Strickland* standard. Petitioner is not entitled to relief on his second ground, and it is recommended that it be denied.

6.    Jury Charge claim

In his ninth ground for relief, Petitioner asserts that his appellate counsel was ineffective for failing to raise a meritorious claim. Specifically, Petitioner argues that his appellate counsel should have argued on appeal that the trial court erred in declining to submit a jury charge regarding the lesser-included offense of murder.

At the guilt phase of the trial, the jury was instructed on the elements of the lesser-included offenses of aggravated assault of a public servant and manslaughter. (Tr. I:171-74). Defense counsel also requested that the jury be instructed on the lesser-included offenses of murder, under Texas Penal Code § 19.02(b)(1) and (b)(2), as well as criminally negligent homicide under Texas Penal Code § 19.05 and deadly conduct under Texas Penal Code § 22.05. These requests were denied by the trial court. (R. 42:110). The jury declined to find Petitioner guilty of either of the lesser-included offenses submitted in the charge. (Tr. I:179). Petitioner contends that his appellate counsel was ineffective for failing to raise as a point of error on appeal the refusal of the trial court to instruct the jury on the lesser-included offense of murder.

Under Texas Penal Code § 19.02(b)(1), a person is guilty of murder if he intentionally or knowingly caused the death of an individual,. Under § 19.02(b)(2), a person is guilty of murder if

he intends to cause seriously bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE § 19.02(b)(1) & (2) (Vernon 1974). Petitioner contends that he was entitled to an instruction on the offense of murder because there was testimony given at trial by defense witness Jasper Mallard that, when he observed Petitioner shooting the victim, it appeared to him that Petitioner was shooting as quickly as possible in order to escape and get away from the police officer. (R. 40:123). Petitioner contends that this testimony is evidence that Petitioner shot the victim with the intention of getting away from the scene, rather than with the intent to kill, thereby requiring a jury instruction on the lesser-included offense of murder under § 19.02(b)(2).

The Court of Criminal Appeals adopted findings of the state habeas court that found that there was no evidence in the record to support a rational basis for the jury to find that Petitioner was guilty of only murder. In particular, the state habeas court found that Petitioner testified at trial that he did not know that his gun had discharged and did not know that Officer Moore had been shot after he left the alcove, although Petitioner did testify that he was aware of the risk of pulling out a loaded gun under the circumstances. (*See* R. 41:53, 60). Accordingly, the state habeas court concluded that, while Petitioner was entitled to lesser-included offenses such as manslaughter or aggravated assault because his testimony raised the issue that he acted recklessly, he was not entitled to a jury charge on murder. Thus, the state habeas court concluded that appellate counsel was not ineffective in this regard. (SHTr. II:514-15).

These findings are not an unreasonable application of federal law. The Fifth Circuit has held that a capital defendant is constitutionally entitled to a lesser-included offense jury charge only if he demonstrates that the evidence presented at trial would permit a jury rationally to find him guilty

of the lesser offense and acquit him of capital murder. *Jones v. Johnson*, 171 F.3d 270 (5th Cir.

1999); *Ransom v. Johnson*, 126 F.3d 716, 724-25 (5th Cir. 1997). *See also Hopper v. Evans*, 456

U.S. 605, 611 (1982) (noting that due process requires that a lesser-included offense instruction be

given only when the evidence warrants such an instruction). In the instant case, the State presented

evidence in support of its theory that Petitioner either intentionally or knowingly killed the victim.

Petitioner, on the other hand, testified that he did not know that his gun had discharged, did not

know that the victim had been shot, and first learned that the victim had been shot from the officers

who arrested him. (R. 41:53, 60). Regardless of Mr. Mallard's testimony about how the shooting

appeared to him from a store across the street, the jury could not have, based on the testimony it

heard at trial from Petitioner and others, *rationally* acquitted Petitioner of capital murder, which

required that Petitioner know that he was shooting Petitioner numerous times, and convict him of

an offense which required that he specifically intended to cause the victim serious bodily injury

when he shot him numerous times. *See Montoya v. Collins*, 955 F.2d 279, 285-86 (5th Cir. 1992)

(holding that a capital murder defendant was not entitled to a jury instruction on the lesser-included

offense of involuntary manslaughter, which requires reckless conduct, where Montoya's version of

events described only an accidental shooting). Instead, because of the testimony given by Petitioner,

the jury in his case was instructed on two lesser-included offenses that required only reckless

conduct on his part.[3] Accordingly, appellate counsel was not ineffective for failing to raise an

---

[3]

    As Respondent notes, the fact that the trial court included the two lesser-included offenses of aggravated assault and manslaughter prevented a situation like that in *Beck v. Alabama*, 447 U.S. 625 (1980), where the Supreme Court held that a capital defendant's constitutional rights were violated because the jury was not permitted to consider a verdict of guilt for a noncapital offense, even though the evidence would have supported such a verdict.

unmeritorious claim on appeal.   Petitioner's ninth ground for is without merit, and it is recommended that it be denied.

7.      Improper Impeachment claim

In his tenth ground for relief, Petitioner contends that his appellate counsel was ineffective for failing to raise the claim that the State improperly impeached a defense witness.  In particular, Petitioner asserts that appellate counsel should have argued on appeal that the prosecution erred when it questioned Jasper Mallard about his mental health.  In response, Respondent argues that this line of questioning was not improper impeachment because the State questioned Mallard about the types of medication he was taking at the time that he witnessed Petitioner shoot Officer Moore, a permissible line of questioning.

As noted earlier, Jasper Mallard testified to what he witnessed of the shooting from a nearby store.  In particular, he testified that the shooter shot the victim several times in succession while the two were standing, but the victim was on his way down to the ground. (R. 40:118-123).  This testimony differed from the testimony of State's witness Brandy Johnson, who testified that the shooter shot the victim one final time when the victim was lying on the ground. (R. 37:213-19).  In a hearing outside the presence of the jury, the prosecutor stated that he wanted to question the witness about his illness, the type of medication he was on, and the effect it had on him.  Over defense counsel's objection, the trial court permitted this line of questioning. (R. 40:113-14).  So, on cross-examination, the prosecutor questioned Mallard about his bi-polar disorder and what medications he was taking for it at the time of the shooting.  Mallard also testified that the medications were supposed to balance one's moods. (R. 40:128-29).  On re-direct examination, Mr. Mallard testified that the medications did not have any effect on his vision or memory. (R. 40:129).

The state habeas court found that the testimony elicited by the State from Mr. Mallard regarding his mental illness and the medications he took was relevant and admissible because it concerned whether Mr. Mallard's condition affected his ability to accurately perceive events. The court therefore concluded that appellate counsel was not ineffective in failing to raise this as an issue. The state habeas court also concluded that prejudice had not been shown because none of Mr. Mallard's testimony contradicted a guilty verdict, given that he testified that he saw Petitioner shoot the victim numerous times at close range and did not testify regarding Petitioner's intent. (SHTr. II:517-19).

The state habeas court's conclusion did not involve an unreasonable application of the *Strickland* standard. As noted by the state habeas court in its findings, the Texas Court of Criminal Appeals has held that, under the Texas rules of evidence, a party may attack a witness's general capacity to tell the truth with evidence of whether the person's physical or mental condition adversely affects his ability to accurately perceive and/or relate events. *See Schutze v. State*, 957 S.W.2d 52, 70-1 (Tex. Crim. App. 1997).

Moreover, as Respondent points out, Petitioner has not pointed to binding federal precedent indicating that the State's cross-examination of Mallard was a violation of clearly established federal law. Instead, Petitioner has cited to several federal cases addressing the *federal* rules concerning impeachment evidence, and these cases also indicate that witnesses may be impeached on their mental condition at the time of the events in question. *See U.S. v. Butt*, 955 F.2d 77, 82 (1st Cir. 1992). Furthermore, Petitioner later appears to concede that such evidence was relevant evidence, arguing instead that the trial court erred in failing to determine whether it was unduly prejudicial. But, in this regard, Petitioner has failed to establish prejudice because he has not shown that the

small amount of testimony regarding Mr. Mallard's mental condition was so unduly prejudicial to the defense that, had it been raised as an issue on appeal, there is a reasonable probability that Petitioner's guilty verdict would have been overturned.  Petitioner's tenth ground for relief is without merit, and it is recommended that it be denied.

## B.     Jury Instruction Claim

In his third ground for relief, Petitioner asserts that the trial court violated his constitutional rights by refusing to instruct the jury in his case regarding his parole eligibility if given a life sentence. Petitioner asserts that his due process and equal protection rights and his right to be free from cruel and unusual punishment were violated because the trial court declined to inform the jury that, if sentenced to life imprisonment, Petitioner would serve forty calendar years before being eligible for parole.

At the time that Petitioner committed this offense, the law in Texas was that a person who received a life sentence would be eligible for parole in forty years. *See* TEX. CODE CRIM. PROC. ANN. art. 42.18 § 8(b)(2) (Vernon Supp. 1991).  Defense counsel requested during trial that the jury be instructed about Petitioner's parole eligibility if given a life sentence in the punishment jury charge (R. 44:81).  The requested jury instruction was denied by the trial court (R. 44:82).  Instead, the jury instruction included the following statement:

> You are further instructed that you cannot consider how long the defendant may be required to serve a sentence that is imposed.  Such matters come within the exclusive jurisdiction of the Board of Pardon and Paroles and are no concern of yours.

(Tr. I:218).  Petitioner contends that the trial court's refusal to instruct the jury on Petitioner's parole eligibility violated his constitutional rights.

51

In making these claims in his federal petition, Petitioner relies on the Supreme Court case *Simmons v. South Carolina*, 512 U.S. 154 (1994).  *Simmons* is a death penalty case in which a plurality of the Supreme Court held that, where a defendant's future dangerousness is an issue in a capital case, and the sentencing options are death or life without the possibility of parole, due process allows the defendant to inform the sentencing jury about his parole ineligibility. *Id.* at 156. Petitioner argues that *Simmons* is applicable to his case because, had he received a life sentence, he would not have been eligible for parole for forty years, a time period Petitioner asserts is comparable to a life sentence without parole, especially as he was nearly forty years old when convicted of capital murder.

Contrary to Petitioner's argument, however, the plurality opinion in *Simmons* specifically limited its holding to cases where the sentencing option is between death and life *without parole*. Justice Blackmun, writing for the Court, went further and stated that "[i]n a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we will not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* at 168.  And the opinion also noted that, differing from South Carolina, Texas has no life-without-parole sentencing option. *Id.* at 168, n. 8. Moreover, since the Supreme Court's decision in *Simmons*, the Fifth Circuit has held that a trial court does not violate a Texas capital murder defendant's Eighth Amendment rights or due process rights by refusing to instruct the jury regarding parole eligibility because *Simmons* does not apply in Texas cases, but only in cases where life-without-parole is a sentencing option. *Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000); *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994).

Petitioner also cites *Brown v. Texas*, 522 U.S. 940 (1997), a case in which the Supreme Court denied a petition for a writ of certiorari by a Texas death penalty defendant. In *Brown*, Justice Stevens issued an opinion entitled "respecting the denial of the petition for writ of certiorari," which was joined by Justices Souter, Ginsburg, and Breyer. In this opinion, Stevens stated that there was an "obvious tension" between the Court's decision in *Simmons* and Texas law which, at that time, prohibited a capital jury from being informed about parole eligibility. Justice Stevens then went on to state that his primary purpose in writing the opinion was not to comment on the merits of Brown's constitutional claims, but instead to reiterate the fact that the denial of a petition for writ of certiorari is neither a decision on the merits of the questions presented nor an appraisal of their importance. *Id.*

Thus, although some Supreme Court justices may have indicated in this opinion a willingness to address this issue sometime in the future, at this point in time there is no federal law in conflict with the state courts' rulings at trial. Indeed, since this opinion in *Brown v. Texas* was issued, the Fifth Circuit has acknowledged the *Brown* opinion and once again reiterated its holding that the ruling in *Simmons v. South Carolina* is not applicable to Texas capital murder trials and that it therefore does not violate a Texas capital murder defendant's constitutional rights to withhold parole eligibility information from the jury. *Hughes v. Johnson*, 191 F.3d 607, 617 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000).

Moreover, even if *Simmons* did apply to the instant case, Petitioner's claim would be *Teague*-barred. In *O'Dell v. Netherland*, 521 U.S. 151, 153 (1997), the Supreme Court held that the rule announced in *Simmons* is a new rule as defined in *Teague v. Lane*, 489 U.S. 288 (1989). The Supreme Court further held that this new rule does not meet the narrow exceptions set forth in

53

*Teague* and therefore cannot provide a ground for federal habeas relief.  *Id.*, *see also Clark v. Johnson*, 227 F.3d 273 (5th Cir. 2000).

On direct appeal, the Court of Criminal Appeals overrruled a point of error based on this same claim, citing their prior case law holding that parole is not an issue applicable to a capital murder case. *Mosley v. State*, slip op. at 28-9.  Based on the decision in *Simmons* and subsequent case law interpreting *Simmons*, Petitioner cannot show that this decision is contrary to clearly established federal law.  Accordingly, this ground for relief is without merit and it is recommended that it be denied.

## X.   REQUEST FOR EVIDENTIARY HEARING

Petitioner has also requested an evidentiary hearing in this Court.  A petitioner is not automatically entitled to a federal evidentiary hearing.  Rather, to be entitled to such a hearing, a habeas petitioner must show either a factual dispute which, if resolved in his favor, would entitle him to relief *or* a factual dispute that would require development in order to assess the claim. *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir.), *cert. denied*, 531 U.S. 951 (2000); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998).  Petitioner has not alleged any factual dispute that would require development in order to assess the merits of the claim.  This Court has accepted all of Petitioner's non-record evidence in considering Petitioner's claims, regardless of whether this evidence was presented to the state courts, and ruled on these claims accordingly, assuming all of Petitioner's non-record evidence to be accurate.  Petitioner is not entitled to a hearing, and it is recommended that his request be denied.

## <u>RECOMMENDATION</u>

Petitioner has failed to make a substantial showing of the denial of a federal right.  Moreover, the state court adjudication on the merits on the claims presented to the state court neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Petitioner's petition for a writ of habeas corpus should be DENIED, except for his tenth ground for relief, which should be DISMISSED on procedural grounds.

Signed this 23rd day of July, 2007.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).